## CREEKMORE et al. v. FIRST NAT. BANK of GROVE.

No. 19545. Opinion Filed April 7, 1931.

Rehearing Denied Oct. 6, 1931.

Davidson & Williams, for plaintiffs in error.

W. H. Kornegay and E. B. Hunt, for defendants in error.

CULLISON, J. Plaintiff brought this suit against defendants to recover $2,400. Plaintiff's petition reads as follows:

"Plaintiff alleges and states: That it is and was at all days and times hereinafter mentioned, a corporation, duly organized and existing under the banking laws of the United States, and having its principal place of business in the town of Grove, Delaware county, state of Oklahoma, and engaged in a general banking business.

"Plaintiff, for its cause of action against the defendants Lon T. Hampton and W. J. Creekmore, alleges and says:

"That, on the 19th day of December, 1925, the defendant W. J. Creekmore made, executed, signed, and delivered to the defendant Lon T. Hampton, a check, drawn on the Conqueror Trust Company of Joplin, Mo., payable to the order of the said Lon T. Hampton, for the sum of $2,400, and that on the same day check was, by the said Lon T. Hampton, for a valuable consideration, and in due course of business, assigned and delivered to this plaintiff, and passed to the credit of the defendant Lon T. Hampton on the books of the plaintiff bank, the said Lon T. Hampton being then and there indebted to said bank in said sum, and afterwards the said W. J. Creekmore, without any right or authority so to do, stopped the payment of said check, to the damage of this plaintiff in the sum of $2,400. A copy of said check, with all indorsements thereon, is hereto attached, marked exhibit 'A,' and made a part of this petition.

"That on or about the 22nd day of December, 1925, said check was protested for nonpayment, of all of which due notice was given the defendants, and the cost of protesting was $3, which this plaintiff has paid.

"That plaintiff is the owner and holder of said check, and entitled to the payment thereof, and said defendants are indebted to this plaintiff in the sum of $2,403, with interest on said sum from the 19th day of December, 1925, at the rate of 6 per cent. per annum, and for costs. and all other proper relief."

Defendants, in their second amended answer, say:

"(1) Comes now the defendants Lon T. Hampton and W. J. Creekmore, and with leave of court first had and obtained, and for their second amended answer to the petition of the plaintiff, allege and state as follows:

"(2) They specifically deny that said check was ever delivered to the plaintiff bank, or that said bank is now or was ever the owner or legal holder of said check; they admit that the defendant Hampton was indebted to said bank on the 19th day of December, 1925, in the sum of about $2,400 as an overdraft, but they specifically deny that any liability exists, or ever existed up-

on the check sued upon in favor of the plaintiff bank against either of these defendants, and they specifically deny that the check sued upon was given or delivered to the plaintiff bank for value or in due course of business.

"(3) For further answer to the petition of plaintiff, the defendants allege and state that the check sued upon was executed by the defendant Creekmore and by him delivered to the defendant Hampton, and by the said defendant Hampton delivered to one Ed Hammond, at the solicitation and request of the president of said bank, Lee Howe, and the cashier of said bank, Ed Hammond, under the following circumstances, to wit: * * *

"(4) These defendants further allege that the president and cashier of the plaintiff bank represented to the defendant Hampton that the plaintiff bank was solvent and could meet its obligations in due course of business, but that the National Bank Examiner was threatening to close the plaintiff bank if they continued to carry the overdraft of about $2,400 of the defendant Hampton; that the defendant Hampton did, in pursuance to the suggestion and request of the plaintiff bank and its officers, seek out the defendant Creekmore, and related the facts and circumstances hereinabove alleged, and requested him to comply with the request and suggestion of the officers of the plaintiff bank; that the defendant Creekmore thereupon executed the check sued upon for $2,400 and delivered the same to the defendant Hampton; that the defendant Hampton thereafter, on the 19th day of December, 1925, between the hours of seven and eight o'clock p. m. of said day, delivered said check to Ed Hammond, who was then cashier of said bank.

"(5) These defendants further allege that the plaintiff bank did not receive or acquire the check sued upon for value, or in due course of business, and is not now and never has been the owner or holder of the same for value in due course of business; that the plaintiff bank did not extend any credit to the defendant Hampton on account of the check sued upon, and did not change or alter its position on account thereof; that the defendant Creekmore executed and delivered the check sued upon to the defendant Hampton solely and alone upon condition that the plaintiff bank would honor and pay the defendant Hampton's check on his personal account in said bank for the Al Hudson cattle. * * *

"(6) These defendants admit that the defendant Hampton is indebted to the plaintiff bank in the sum of about $2,400 as an overdraft on the 19th day of December, 1925, which had been created previous thereto, and had been carried on the books of the bank sometime previous thereto, but they specifically say that there is no liability upon said check against either of these defendants for the reasons hereinabove set forth."

Case was tried to a jury, who found for the plaintiff. Motion for new trial presented January 18, 1928, and by the court overruled. Exceptions allowed.

On January 28, 1928, court rendered judgment for plaintiff in the sum of $2,671.67, and interest, to which defendants excepted and gave notice of appeal.

Parties will be referred to as they appeared in the court below.

Plaintiffs in error, defendants below, assign 27 errors on the part of the trial court, but announce they will discuss them together.

The peadings, supra, in the instant case very clearly set out the contentions of both parties, which may be briefly stated as follows:

The defendant Lon T. Hampton was indebted to the plaintiff bank in the sum of $2,400 overdraft. On or about December 19, 1925, plaintiff bank demanded payment of overdraft from Hampton. Hampton, by aid of defendant Creekmore, arranged to take up the overdraft as follows: Creekmore drew his check on Conqueror Trust Company of Joplin, Mo., payable to the defendant Lon T. Hampton in the sum of $2,400. Hampton indorsed the Creekmore check and delivered the same to the plaintiff bank. Plaintiff bank accepted the Creekmore check and placed same to credit of Hampton's account. This arrangement took up the Hampton overdraft. On the 21st day of September 1925, the national bank examiner, who was in charge of plaintiff bank, transmitted the Creekmore check in regular course to the Conqueror Trust Company of Joplin, Mo. Payment of check was refused by the Conqueror Trust Company, and returned to the national bank examiner, and is now held as part of the cash assets of plaintiff bank. Plaintiff bank was closed by order of the national bank examiner on the 22nd day of December, 1925, but in a short time reorganized and reopened for business. Plaintiff bank brought action against defendants to recover the amount of said check, together with interest thereon and for costs of this action. Plaintiff bank obtained judgment against defendants, supra. Defendants are now before this court on appeal.

Plaintiff bank says it accepted the check in good faith as a valid obligation, believing the check was good and that it would be paid in the regular course of business and for these reasons gave the defendant Hamp-

ton credit on his overdrawn account in the sum of $2,400. Said check is now part of the assets of said bank.

The defendants contend and say that the plaintiff bank did not receive or require the check sued upon for value or in due course of business and is not now and never has been the holder or owner of the same for value in due course of business, supra.

The entire matter can be condensed into one question, viz.:

"Is the plaintiff bank the rightful owner and holder of the check in question?"

The question is largely one of fact and can only be determined by a review of the testimony.

The defendants, as a defense to the plaintiff's action, allege and state in paragraph 2 of their second amended answer:

"For further answer to the petition of plaintiff the defendants allege and state that the check sued upon was executed by the defendant Creekmore and by him delivered to the defendant Hampton and by the said defendant Hampton delivered to one Ed. Hammond at the solicitation and request of the president of said bank, Lee Howe, and the cashier of said bank, Ed Hammond, under the following circumstances, to wit: * * *"

Defendants further plead and say, in part, paragraph 2, page 5, of their brief:

"The president and cashier of the bank on the 19th day of December sought out and got into communication with the defendant Hampton and requested that he at once protect the overdraft in the plaintiff bank and suggested to him and requested him to see the defendant Creekmore and get him to give the defendant Hampton his check for $2,400 to be used by him and the plaintiff bank until the Al Hudson cattle could be received and sold, when the defendant Creekmore was to receive back from the defendant Hampton and the plaintiff bank out of the proceeds of the Al Hudson cattle the said $2,400 so advanced by defendant Creekmore for the use of the defendant Hampton and the plaintiff bank. * * *"

They further state, at page 11 of defendants' brief:

"That the defendant Creekmore executed and delivered the check sued upon to the defendant Hampton solely alone upon the condition that the plaintiff bank would remain open and continue business and that the defendant bank would honor and pay the defendant Hampton's check upon his personal account in said bank for the Al Hudson cattle. * * *"

Again, at page 21 of the brief:

"That if Creekmore wanted to buy the Al Hudson cattle and they could agree upon the price that the $2,400 which Hampton asked Creekmore to let him have would be applied upon the purchase price of the cattle but if he did not want to buy the cattle then Creekmore would be repaid the $2,400 out of the proceeds of the cattle when sold. Creekmore agreed to accommodate Hampton and the bank under these circumstances and he and Hampton proceeded on to Grove and went into the bank and had a conversation with Mr. Hammond, the cashier, in which conversation, according to the testimony of Creekmore and Hampton, Hammond, as cashier of the bank, agreed to the arrangement and Creekmore wrote out his check on the Conqueror Trust Company of Joplin, Mo., for $2,400 and delivered it to Hampton. * * * And Hampton indorsed the check and delivered it to Hammond."

It will be observed that the defendants herein contend that they had an understanding, or agreement, with Mr. Hammond, cashier of plaintiff bank, that if Creekmore would put up his check for $2,400, said amount would be applied on the purchase price of the Al Hudson cattle if he (Creekmore) wanted to buy the same, but if he did not want to buy the cattle, then Creekmore would be repaid the $2,400 out of the proceeds (sale) of the Al Hudson cattle when sold.

Defendant Creekmore, in his cross-examination, testified as follows:

"Q. Now, Mr. Creekmore, I believe you contend that there was an understanding that this bank would advance the money to buy the Al Hudson cattle? A. Yes, sir,—By Mr. Hammond, there was, yes, sir." (502 C-M.)

Again, defendant Creekmore said (503 C.-M.):

"A. I wouldn't say that the bank said that, but I had that understanding with Mr. Hampton, I am sure, but, now, as far as Mr. Hammond saying that, that night, I wouldn't say that he did."

Defendant Creekmore further testified (506 C.-M.):

"Q. I just want you to tell about the agreement about these Al Hudson cattle. A. Well, the agreement was,—my understanding was, if I put in this $2,400, that after the bank examiner had left then they would pay for these cattle and I was to get my money out of them cattle, and when I put that check up to cover that overdraft."

In fact he testified (503 C.-M.):

"A. I would not say that the bank said that, but I had that understanding with Mr. Hampton."

Creekmore further testified (235 C.-M.):

"No, sir; I didn't know anything about the cattle at all, only what Hampton told me about buying the cattle."

The defendant Hampton, on cross-examination (250 C.-M.), testified:

"Q. On the 19th when you were talking with Mr. Creekmore about this $2,400 check did you tell him then, or at any other time, that you had this contract with the bank and that the bank was advancing you money to pay for this stock that you were buying? A. No, sir."

We have very carefully reviewed the relevant and pertinent testimony in the case.

We find from the evidence that the defendant Hampton was in debt to the plaintiff bank in the sum of $2,400 overdraft; that the bank called upon him to pay his overdraft; that he, Hampton, told the bank officers he would pay the overdraft in a very short time; that Creekmore was in town or would be in a short time, and that he could arrange with Creekmore to get the money with which to pay the overdraft. Hampton met Creekmore between Jay and Grove, talked the matter over, then these defendants went to Grove. About 5 or 6 o'clock on the 19th day of December, 1925, the defendants went to the bank; the defendants went into the back room of the bank, there engaged in a conversation between themselves only. During the conversation between defendants, Hampton called to E. D. Hammond, cashier of the bank, and asked the cashier the amount of his overdraft and was informed by Hammond, cashier, that his (Hampton's) overdraft was $2,400. The defendants and Hammond, the cashier, were the only persons in the bank at this time. A few moments after Hampton had called for the amount of his overdraft, Hampton delivered the check sued upon to the cashier. The evidence shows that the check was drawn on the Conqueror Trust Company of Joplin, Mo.,; was made payable to Hampton; signed by Creekmore, and indorsed by Hampton; and by Hampton delivered to the bank cashier.

The bank's officers were thoroughly examined and cross-examined as to this purported agreement between the defendants and the bank, viz.: "That Creekmore's money was to be returned to him out of the sale of the Al Hudson cattle," but it would serve no good purpose to set out their testimony in full, suffice it to say.

Lee Howe testifies in part (401-403 C.-M.):

"Q. Mr. Howe, did you ever talk to Mr. Creekmore anything about this check and its coming into the bank? A. Yes, I asked him once why he turned the check down and he said that Mr. Hampton had wired him to turn it down and that—I believe he had called him on the phone and told him to turn the check down, that the bank had failed and to turn the check down. Q. Were you about the bank the day that Mr. Creekmore, or rather, Mr. Hampton, brought this check in there? A. Yes, sir. Q. Did you know anything about the agreement on your part, or the part of the bank, to cash a check for some Al Hudson cattle in connection with this check? A. I did not. Q. When did you first hear of a supposed talk, or rather, an agreement that the bank would furnish the money to Hampton to pay for the Al Hudson cattle, with reference to the time that this check got into the bank? A. When the—or some one, said that that was the plea they made in answer to our suit. Q. Was that the first you ever heard of it? A. That was the first I ever heard of it, yes, sir. Q. Was there such a thing as that mentioned at the time, on December 19, 1925? A. There was not. Q. Was there an agreement of any sort concerning that at any time? A. There was not. Q. Coming specifically to about a week before that, I will ask you the direct question whether or not on behalf of the bank you had agreed with Mr. Hampton to advance the money to pay for the Al Hudson cattle? A. I did not. No, sir. I thought if I got what he owed me I would be pretty well satisfied."

Mr. Ad V. Coppedge, at one time attorney for plaintiff bank, testified (395, C.-M.):

"When did you first hear about the Al Hudson cattle having anything to do with this check? A. I first heard that when these answers commenced to be filed in this case."

E. D. Hammond, cashier of plaintiff bank, testified (436-437 C.-M.):

"Q. I wish you would just tell the court and jury here what the transaction was with reference to that check, and how it came into the bank, and all about it. A. Well, this check was delivered to me as cashier of the bank on December 19, 1925, indorsed by Lon T. Hampton and I gave Mr. Hampton credit for it and the credit and the check went into the assets of the bank on that day. Q. Well, how did he happen to give you Mr. Creekmore's check? Do you know? A. Mr. Hampton and Mr. Creekmore came in the bank some time along towards evening and came into what we call our bank room, there. Mr. Creekmore, apparently—I didn't see him do it, but apparently he wrote this check to Mr. Hampton, and Hampton indorsed it and gave it to me and I gave him credit for it. Q. What was the state of Mr. Hampton's account at that time? It was overdrawn about $2,400. Q. In what form did it show up in the bank there? A. The overdraft was carried as a cash item. Q. Now, Mr. Hammond, it seems that the Al Hudson

cattle have got mixed in with this a little, in the testimony of some of these parties here,—I wish you would tell the court and jury what you know about a deal in which the bank was to advance some money to buy the Al Hudson cattle? A. The bank made no deal to advance any money to buy the Al Hudson cattle to my knowledge. Q. When did you first learn that there was a claim to the effect that the bank was advancing money to buy the Al Hudson cattle? A. I don't remember, but I think sometime after the bank,—after the reorganization was done and this suit was filed,—I don't know whether the suit was filed at that time or not. Q. Was there any talk or conversation at the time or before the time this check of Mr. Creekmore was put in the bank there, about the bank furnishing money to buy the Al Hudson cattle? A. There was not. Q. Mr. Hammond, it seems to have been in here, too, that there was something to the effect that you and Mr. Howe agreed with Mr. Creekmore to take this check of Mr. Creekmore and hold it until the bank examiner left,—What was there about that, if anything? A. No agreement that I know of. Mr. Howe wasn't in the bank when this check was delivered to me. Q. Well, was there any talk by you? A. There was not. Q. To that effect? A. There was not. Q. Did you have any authority to make such an agreement under your regulations there? A. I have no authority to make such an agreement."

We think the testimony both of plaintiff and defendants very clearly disproves the contention of defendants; that defendants have wholly failed to show any legal defense to plaintiff's right to recover.

Plaintiffs in error, defendants below, offer and plead many other errors. They complain, among other things: That the court erred in its instructions to the jury; that it failed to tell the jury "that the defendants had raised the question of fraud."

We fail to find any fraud on the part of the plaintiff bank.

We are convinced that the plaintiff bank had implicit confidence in the integrity and and financial ability of Mr. Creekmore and accepted his check of $2,400 in good faith, in payment of Hampton's overdraft, and gave Hampton credit for the full amount of the check.

We further find and hold that the subsequent failure of the bank had nothing to do with the issue sought to be litigated in the instant case.

We have very carefully examined the instructions to the jury by the court, and are of the opinion they fairly state the law and theory of the case. We are of the opinion

that defendants were not entitled to the instructions offered by them and refused by the court.

The entire matter was fully presented to the court and jury.

The jury returned its verdict in favor of plaintiff bank. The court rendered judgment against the defendants, as was his duty to do.

We deem it unnecessary to further discuss the contentions or defense of the defendants. That under the law, facts and circumstances in the case, defendants have failed to offer any defense, legal or equitable, which will enable them to avoid payment of the check sued upon.

The law of the case can be expressed in a few words. Let us not forget that the check sued upon was an order to pay the money to Hampton, which Hampton used to pay his debt to the bank.

The defendants urged no other defense than the alleged agreement with the cashier of plaintiff bank "that they, or Creekmore, would not have to pay the check." We are of the opinion, and the authorities so hold, that the cashier of a bank is not clothed with such authority.

And we are further of the opinion that the purported agreement set up as a defense by defendants was not properly in the case and the defendants had no right to have the same submitted to the jury upon any theory.

Section 5035, C. O. S. 1921, provides:

"The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument. * * *"

In the case of Elling v. Bank of Jefferson, reported in 114 Okla. 147, 244 Pac. 793, the first paragraph of the syllabus reads as follows:

"(1) Where a cashier of a bank represents to persons executing promissory accommodation notes that the bank will loan money to a third party and the payors of notes will not be called upon to pay the same, in the absence of a showing of specific authority vested in the cashier to make such representations, such representations constitute no defense to an action by the bank on the notes."

The second paragraph of the syllabus thereof reads:

"(2) A bank cashier as such, has no authority to bind the bank by a promise, made

to persons executing notes to a third party, that the maker of the notes will not be required to pay the same, for the reason that the cashier was acting without the scope of his authority."

We find and hold that plaintiff bank is the rightful owner and holder of the check sued upon.

The judgment of the trial court is in all things affirmed.

RILEY, HEFNER, SWINDALL, ANDREWS, and McNEILL, JJ., concur. LESTER, C. J., concurs in conclusion. CLARK, V. C. J., dissents. KORNEGAY, J., disqualified.

Note.—See under (1, 2) anno. 28 L. R. A. (N. S.) 511; 3 R. C. L. p. 448.